## THE STATE VS. MORRILL.

This court has the constitutional power to punish, as for contempt, for the publication of a libel, made during a term of the court in reference to a case then decided, imputing to the court, officially, *bribery* in making the decision — such power being inherent in courts of justice, springing into existence upon their creation, as a necessary incident to the exercise of the powers conferred upon them.

The Legislature may regulate the exercise of, but cannot abridge the express, or necessarily implied powers granted to this court by the constitution.

The statute, (*Digest, chap.* 36, *sec.* 1,) so far as it sanctions the power of the courts to punish, as contempts, the acts therein enumerated, is merely declaratory of what the law was before its passage : the prohibitory clause is entitled to respect as an opinion of the Legislature, but is not binding on the courts.

By the common law, courts possessed the power to punish, as for contempt, libelous publications upon their proceedings, pending or past, tending to degrade the tribunals, destroy that public confidence and respect for their judgments and decrees, so essential to the good order and well being of society, and to obstruct the free course of justice.

When the Supreme Court was created by the constitution, and certain judicial powers conferred upon it, the power to punish contempts of its authority, was impliedly given to it as a necessary incident to the exercise of its express powers.

There is no feature in the constitution, or in the character of our free institutions, which denies to this court the power to punish, as for contempt, libelous publications tending to degrade its authority, and destroy public confidence in the integrity of its judgments and decrees.

The fact, that the convention, which framed the constitution, had the subject of contempts before them, and placed a limitation upon the legislative, but none upon the judicial department, to punish contempts, warrants the conclusion that the courts were left to exercise such common law powers on the subject, as might be necessary to preserve their authority, and enforce their legal process, orders, judgments, and decrees.

Any citizen has a right to comment upon the proceedings and decisions of this court, to discuss their correctness, and the fitness or unfitness of the judges for their stations, and the fidelity with which they perform the important trusts reposed in them; but he has no right, under the 7th section of the Bill of Rights, to attempt, by libelous publications, to degrade the tribunal, &c.—such publications are an abuse of the liberty of the press, for which he is responsible.

The cases of *Neil vs. The State,* 4 *Eng. Rep.* 263, *and Cossart vs. The State,* 14 *Ark.* 541, quoted with approbation.

### *Rule to answer for contempt of Court.*

Mr. Attorney General JORDAN, for the State.

S. H. HEMPSTEAD and W. L. D. WILLIAMS, for defendant.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 29th of March last, a member of the bar of this court, then in session, addressed a communication to one of its judges, calling his attention to an article in a newspaper, styled the DES ARC CITIZEN, issued on the 24th of that month, purporting to be published by the defendant, reflecting upon a decision made by this court, during that term, apparently impugning its motives, and attributing the decision to extraneous influences. The author of the communication referred to, accompanied it by a copy of the newspaper, giving it, as his opinion, that the court ought to take some notice of the publication, and stating that his position, as a member of the bar, &c., seemed to require, at his hands, an expression of the opinion entertained by him, that the dignity

and usefulness of the court would be upheld, and not impaired, by making an example of the offensive publication.

The publication thus having been brought directly to the notice of the court, by a member of the bar, expressing that interest in the preservation of public respect, for the decisions of a tribunal of final resort, which the worthier members of the profession, as well as all orderly and law-abiding citizens, usually manifest, the court concluded that it was due to the honor and dignity of the State, and its own usefulness, not to pass the matter by without some official action, but to institute an inquiry whether its constitutional privileges had not been invaded by the publication aforesaid. Accordingly, an order was made, reciting the publication, and directing that the defendant be summoned to appear before the court, at its present term, to show cause why proceedings should not be had against him, as for criminal contempt. No attachment but a mere summons, was issued in the outset, because the constitutional power of this court, to punish as for contempt in such cases, had not been determined, and was supposed to be not altogether free of doubt.

The facts upon which the summons was grounded, are briefly these:

One Ellis was lodged in the jail of Pulaski county, on a charge of murder, failing to give the bail required by the committing magistrate. The office of the Circuit Judge of the district in which the offence was committed, being at the time vacant, Ellis applied to this court for a *habeas corpus*, alleging that the bail required by the magistrate, was excessive; that he was unable to give it, and praying the court to inquire into the matter, and reduce the amount of the bail, &c. The writ was accordingly issued, the cause heard on the 20th of February last, upon the testimony produced, and the court being of the opinion that the offence was a bailable homicide, ordered the prisoner to be let to bail upon a recognizance, in the sum of $5000 00, with good and sufficient security for his appearance at the ensuing term of the Prairie Circuit Court, where the offence was cognizable. Failing

to furnish the bail required, the prisoner was remanded to jail, with the privilege of being brought before the court again to enter into the recognizance, should he procure the requisite securities—which he failed to do.

On the 24th of March following, and while the court was still in session, the defendant, it appears, from motives which it is of no consequence to conjecture, published the article in question, directly in reference to the decision of the court, upon the application of Ellis.

The language of the article would seem to intimate, by implication, that the court was induced by *bribery*, to make the decision referred to. It is not an attack upon the private character or conduct of the members of the court, as men, but seems to be an imputation against the purity of their motives while acting officially, as a court, in a specified case. Had the publication referred to them, as individuals, or been confined to a legitimate discussion of the correctness of their decision, in that or any other case, no notice would have been taken of it officially.

In response to the summons, the defendant has filed a plea to the jurisdiction, submitting that the publication is not embraced within the statute, regulating the punishment of contempts, and that the court can punish no act as such not therein enumerated, claiming the privilege of making a further answer, should the plea be held insufficient.

In determining the sufficiency of the plea, to which the Attorney General has interposed a demurrer, it must be assumed that the intimation of bribery contained in the publication, was designed to apply to the court, as such would seem to be the purport of the language employed, though the counsel of the defendant have stated that such was not his intention, and that if required to answer further, he would disclaim upon oath any intention to make such an imputation against the court: remarking, simply, that if such was not the design of the defendant, he was unfortunate in the selection of language, and the construction of his sentences.

The statute, on the subject of contempts, declares that "Every court of record shall have power to punish, as for criminal contempt, persons guilty of the following acts, and no others :

*First.* Disorderly, contemptuous, or insolent behavior, committed during its sitting, in its immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority. *Second.* Any breach of the peace, noise or disturbance, directly tending to interrupt its proceedings. *Third.* Wilful disobedience of any process or order lawfully issued, or made by it. *Fourth.* Resistance wilfully offered, by any person, to the lawful order or process of the court. *Fifth.* The contumacious and unlawful refusal of any person to be sworn as a witness, and when so sworn, the like refusal to answer any legal and proper interrogatory." *Digest, chap.* 36, *sec.* 1, approved February 28th, 1838.

It is conceded that the act charged against the defendant in this case, is not embraced within either clause of this statute.

It was argued by the counsel for the defendant, that the court must look to the statute for its power to punish contempts, and not to any supposed inherent power of its own, springing from its constitutional organization. That it is controlled by the statute, and cannot go beyond its provisions. In other words, that the will of a co-ordinate department of the government is to be the measure of its power, in the matter of contempts, and not the organic law, which carves out the land-marks of the essential powers to be exercised by each of the several departments of the government.

In response to this position, we say, in the language of Mr. Justice SCOTT, in *Neil vs. The State*, 4 *Eng.* 263, that : "The right to punish for contempts, in a summary manner, has been long admitted as *inherent in all courts of justice*, and in legislative assemblies, founded upon great principles, which are coeval, and must be co-existent with the administration of justice in every country, the power of self-protection. And it is only where this right has been claimed to a greater extent than this, and the

foundation sought to be laid for extensive classes of contempts not legitimately and necessarily sustained by these great principles, that it has been contested. It is a branch of the common law, brought from the mother country and *sanctioned by our constitution*. The discretion involved in the power is necessarily, in a great measure, arbitrary and undefinable, and yet, the experience of ages has demonstrated that it is compatible with civil liberty, and auxiliary to the purest ends of justice, and to the proper exercise of the legislative functions, especially when these functions are exerted by a legislative assembly."

And in the language of Mr. Chief Justice WATKINS in *Cossart vs. The State*, 14 *Ark. Rep.* 541 : "The power of punishing summarily and upon its own motion, contempts offered to its dignity and lawful authority, is one inherent in every court of judicature. The offence is against the court itself, and if the tribunal have no power to punish in such case, in order to protect itself against insult, it becomes contemptible and powerless, also, in fulfilment of its important and responsible duties for the public good. It is no argument that the power is arbitrary, though indeed settled by precedents, or limited by them, as rules for the future guidance of the courts. While experience proves that the discretion, however arbitrary, has never been liable to any serious abuse, it would be a sufficient answer to say, that the power is a necessary one, and must be lodged somewhere; and it is properly confided to the tribunal against whose *authority* or *dignity* the offence is committed."

And so, in *United States vs. Hudson et al.*, 7 *Cranch* 32, it was held, that "Certain implied powers must necessarily result to our courts of justice from the nature of their institution. To fine for contempt; imprison for contumacy; enforce the observance of, order, &c., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others ; and so far, our courts no doubt possess powers not immediately derived from statute."

Without resorting to the English authorities, where one of the

counsel for the defendant supposes a rigorous doctrine prevails on the subject of the power of the courts to furnish for contempts, in consequence of the fiction that the majesty of the king is deemed to be present in all the courts, in the persons of the judges, it might be shown, were it supposed to admit of serious question on the part of even the learned counsel for the defence themselves, that every enlightened jurist in the United States, who has treated of the subject, has held that the power to punish for contempts, is inherent in courts of justice, springing into existence upon their creation, as a necessary incident to the exercise of the powers conferred upon them.

Had the Legislature never passed the act above quoted, or any act at all on the subject, could it be doubted that this court would possess the constitutional power to preserve order and decorum, enforce obedience to its process, and maintain respect for its judgments, orders, and decrees, and as a necessary consequence, punish for contempts against its authority and dignity, without which it could never accomplish the useful purposes for which it was established by the framers of the constitution?

If the General Assembly were to repeal the act, would any lawyer seriously contend that the courts were thereby deprived of the power to punish contempts? One of the counsel of the defendant frankly admitted that they would not, and the admission concedes the position to be true, that the power of this court to punish contempts, is inherent, springing into life along with, and as an incident to, those great judicial powers carved out for its exercise by the constitution.

The Legislature may regulate the exercise of, but cannot abridge the express or necessarily implied powers, granted to this court by the constitution. If it could, it might encroach upon both the judicial and executive departments, and draw to itself all the powers of government: and thereby destroy that admirable system of checks and balances to be found in the organic framework of both the Federal and State institutions, and a favorite theory in the governments of the American people.

As far as the act in question goes, in sanctioning the power of the courts to punish, as contempts, the "*acts*" therein enumerated, it is merely declaratory of what the law was before its passage. The *prohibitory* feature of the act can be regarded as nothing more than the expression of a judicial opinion by the Legislature, that the courts may exercise and enforce all their constitutional powers, and answer all the useful purposes of their creation, without the necessity of punishing as a contempt any matter not enumerated in the act. As such, it is entitled to great respect, but to say that it is absolutely binding upon the courts, would be to concede that the courts have no constitutional and inherent power to punish any class of contempts, but that the whole subject is under the control of the legislative department; because, if the General Assembly may deprive the courts of power to punish one class of contempts, it may go the whole length, and divest them of power to punish any contempt.

But it was argued by the learned counsel for the defendant, that if it be assumed that a common law power to punish contempts arose upon the creation of our courts, as a necessary incident to the constitutional functions to be performed by them, it follows that the whole of the common law on the subject was adopted: and that such hypothesis would lead to an absurd result; because, under the provisions of the common law, the courts of England *punished* many frivolous acts as contempts, and imposed cruel and degrading punishments.

This argument may be answered in the language of Mr. Justice SCOTT, in *Neil vs. The State*, where he said, in discussing this subject: "It has never been contended, in this country, that the common law, although it is our birthright, and in force among us, without express recognition by our constitution and laws, was ever actually in force in all its length and breadth, but only to an extent that was not wholly inconsistent with those great principles upon which our free institutions, purely American, have been reared and maintained. So, these doctrines, which we are considering, [*power of courts to punish contempts,*] in being re-

cognized by the courts, must be regarded as having received a corresponding abatement of those of its lineaments which are at open war with the nature and character of our constitution, and the actual state of things among us, under its legitimate operation, or it would be an exotic that could not germinate in our soil."

It was further submitted by the counsel for the defence, that the publication of a libel upon the official action of a court, being an out-door affair, was not, by the common law, the subject of contempt, and if it were, it was only so where the publication was made in reference to a cause pending in court; and that inasmuch as the publication in question was made after the case of *Ellis* had been determined by the court; and was, therefore, not *pending*, it does not fall within the definition of common law contempts.

*In Neil vs. The State*, the common law doctrine of contempts was thoroughly examined and discussed by this court, and the rule thus stated as the result: "By the common law, a court may punish for contemptuous conduct toward the tribunal, its process, the presiding judge, or for indignities to the judge while engaged in the performance of judicial duties in vacation, *or for insults offered him in consequence of judicial acts:* but indignities offered to the person of the judge in vacation, when not engaged in judicial business, *and without reference to his official conduct*, are not punishable as contempts."

In the course of the opinion, Mr. Justice Scott said: "It is of no importance whether the contumely be used in open court, at the moment when the occasion occurs, or the moment afterwards, when the sheriff has proclaimed the adjournment. The only real question in either case, is *whether it is the official conduct for which the judge is challenged and insulted*."

Mr. Blackstone (*Book* 4, *p.* 284,) says: "The contempts that are thus punished, are either *direct*, which openly insult or resist the powers of the courts, or the persons of the judges who preside there; or else *consequential*, which (without such gross in-

solence, or direct opposition) plainly tend to create an universal disregard of their authority."

And then after enumerating the classes of contempts punishable by the courts of England, (some of which would not be punished here in consequence of the modifications of the common law, produced by our constitution, and the character of our institutions as above indicated,) he remarks further:

"Some of these contempts may arise in the face of the court, as by rude and contemptuous behavior; by obstinacy, perverseness, or prevarication; by breach of the peace; or any wilful disturbance whatever: others, in the absence of the party, as by disobeying or treating with disrespect the King's writ, or the rules or process of the court; by perverting such writ or process to the purposes of private malice, extortion, or injustice; by speaking *or writing contemptuously of the court or judges, acting in their judicial capacity;* by printing false accounts (or even true ones, without proper permission) of causes then depending in judgment; and by any thing, in short, that *demonstrates a gross want of that regard and respect, which when once courts of justice are deprived of, their authority* (so necessary for the good order of the kingdom) is entirely lost among the people."

The remark of Mr. BLACKSTONE, that it is a contempt to *print true accounts* of causes pending in judgment, is explained by a note of Mr. CHITTY, thus: "We have already seen that the defendant may be punished for disobedience of an order by a court of general gaol delivery, prohibiting the publication of proceedings pending a trial there.  4 *B. & A.* 218; 1 *B & A.* 379."

The offence did not consist in publishing the truth, but in disobeying an order which the court found it necessary to make in order to secure the ends of public justice.

On the trial of *Holmes*, Judge BALDWIN, found it necessary to make an order prohibiting reporters coming within the bar of the court, from publishing the proceedings and evidence in the case, until the trial was concluded, and no one could doubt his authority to punish disobedience to such an order.  *U. S. vs. Holmes,*

*Wallace C. C. Rep.* 1. Such orders have been frequently made in important and exciting trials in this country.

In a case reported in 2 *Atkyns*, 469, which was a proceeding, as for contempt, for the publication of a libel, Lord Chancellor HARD-WICK said: "Nothing is more incumbent upon courts of justice, than to preserve their proceedings from being misrepresented; nor is there anything of more pernicious consequence, than to prejudice the minds of the public against persons concerned as parties in causes before the cause is finally heard. It has always been my opinion, as well as the opinion of those who have sat here before me, that such proceeding ought to be discountenanced.

"But, to be sure, Mr. Solicitor General has put it upon the right footing, that notwithstanding this should be a libel, yet, unless it is a contempt of the court, I have no cognizance of it; for whether it is a libel against the public, or private persons, the only method is to proceed at law.

"*One kind of contempt is scandalizing the court itself.* There may be, likewise, a contempt of this court, in abusing parties who are concerned in causes here. There may be also a contempt of this court in prejudicing mankind against persons before the cause is heard. There cannot be anything of greater consequence than to keep the streams of justice clear and pure, that parties may proceed with safety both to themselves and their characters."

The counsel for the defence, stated that it was a contempt at common law, for a counsel to print his brief before the cause was heard, arguing from this, the extremes of the common law doctrine on the subject, and citing the above case from 2 *Atkyns*.

Now what Lord HARDWICK said on that point, was this: He was arguing that there was a class of publications which were contempts, though they did not reflect upon the court, but prejudiced the public mind before the cause was heard, and said: "There are several other cases of this kind, one strong instance, where there was nothing reflecting upon the court, is the case of Capt. Perry,

who printed his brief before the cause came on : *the offence did not consist in the printing, for any man may give a printed brief, as well as a written one, to counsel : but the contempt of this court, was prejudicing the world with regard to the merits of the cause before it was heard.*"

Mr. HOLT, in his work on *Libel, chap.* 9, says : "Contemptuous words or writings, concerning courts of justice, or concerning parties engaged in causes therein, with a view of prejudicing judges or jurors, have, in all periods of our law, been visited with exemplary punishment.

"As they obstruct the law, and corrupt the very fountains of justice, the wisdom of the constitution has enabled the courts, who are the subjects of such scandal, with a view to protect themselves and their suitors to proceed immediately against the offenders by the summary remedy of an attachment.

"There are different sorts of contempt—one kind of contempt is scandalizing the court itself, &c.

"It is, therefore, a rule founded on the reason of the common law, that all contempts to the process of the court, to its judges, jurors, officers, and ministers, when acting in the due discharge of their respective duties, whether such contempts be by direct obstruction, or consequentially ; that is to say, whether they be by act or writing, are punishable by the court itself, and may be abated *instanter* as nuisances to public justice.

"There are those who object to attachments, (continues Mr. HOLT,) as being contrary, in popular constitutions, to first principles. To this it may briefly be replied, that they are the first principles, being founded on that which founds government and constitutes law. They are the principles of self-defence ; the vindication, not only of the authority, but of the very power of acting in a court. It is in vain that the law has the right to act, if there be a power above the law, which has a right to resist: the law would then be but the right of anarchy and the power of contention."

He says, moreover : "It is undoubtedly within the natural com-

pass of the liberty of the press, to discuss, in a decent and tem-
perate manner, the decisions and judgments of a court of justice;
to suggest even error; and, provided it be done in the language,
and with the views of fair criticism, to censure what is apparently
wrong; but, with this limitation, that no false or dishonest mo-
tives be assigned to any party."

Any public reflection on the administration of justice, is un-
questionably libelous."

Mr. HOLT concludes the chapter, with the following remarks,
which meet our entire approval.

"Every mode of administering justice, which encroaches upon
the trial by jury, ought to be watched with anxious jealousy. It
is necessary, as we have shown, that courts of justice should have
the power to punish for contempts: but it is a power which has
its justification in necessity alone, and should rarely be exercised,
and never, but in those cases where the necessity is plain and
evident."

In the case of *Respublica vs. Oswald*, 1 *Dallas* 319, which was
a proceeding against *Oswald*, for a newspaper libel, McKEAN,
Chief Justice, delivering the judgment of the court, said: "Hav-
ing yesterday considered the charge against you, we were unani-
mously of opinion, that it amounted to a contempt of the court.
Some doubts were suggested, whether, even a contempt of the
court was punishable by attachment; but not only my brethren
and myself, but likewise all the judges of *England*, think that
without this power, no court could possibly exist. Nay, that no
*contempt* could indeed be committed against us, we should be so
*truly contemptible*. The law upon the subject is of immemorial
antiquity, and there is not any period when it can be said to have
ceased, or discontinued. On this point, therefore, we entertain
no doubt."

This case was decided after the adoption of the BILL OF RIGHTS
in Pennsylvania, guaranteeing the freedom of the press, and will
be referred to again in the sequel of this opinion.

In 1765, a motion was made in the King's Bench, for an at-

tachment against Mr. Almon, for a contempt in publishing a libel upon the court, and upon the Chief Justice. In consequence of the resignation of the Attorney General, the prosecution was dropped, but *Chief Justice Wilmot* prepared an able opinion in the case, which was left among his papers, and published by his son after his death. It is reported in the 8*th vol. of State Trials, p.* 54. After showing that the authority of the courts to punish contempts by attachment was not derived from statute, as seems to have been argued for the defence, he says: "The power which the courts in Westminister Hall have of vindicating their own authority, is coeval with their first foundation and institution; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt to the court, acted in the face of it, (1 *Vent.* 1) and the issuance of attachments by the Supreme Courts of justice in Westminister Hall, for contempts out of court, stands upon the same immemorial usage, as supports the whole fabric of the common law; it is as much the " *lex terræ*, and within the exception of *magna charta*, as the issuing any other legal process whatever.

"I have examined very carefully to see if I could find out any vestiges or traces of its introduction, but can find none: it is as ancient as any other part of the common law. And though I do not mean to compare and contrast attachments with trials by jury, yet truth compels me to say, that the mode of proceeding by attachment stands upon the same foundation and basis as trials by jury do, immemorial usage and practice; it is a constitutional remedy in particular cases, and the judges in those cases are as much bound to give an activity to this part of the law as to any other part of it. Indeed it is admitted, that attachments are very properly granted for resistance of process, or a contumelious treatment of it, or any violence or abuse of the ministers, or others employed to execute it.

But it is said, that the course of justice in those cases is obstructed, and the obstruction must be instantly removed; that there is no such necessity in the case of libels upon courts or

judges, which may wait for the ordinary method of prosecution, without any inconvenience whatever. But where the nature of the offence of libeling judges, for *what they do in their judicial capacities*, either in court, or out of court, comes to be considered, it does, in my opinion, become more proper for an attachment than any other case whatever.

"The arraignment of the justice of the judges, ** excites in the minds of the people a general dissatisfaction with all judicial determinations, and indisposes their minds to obey them ; and whenever men's allegiance to the laws is so fundamentally shaken, it is the most fatal and the most dangerous obstruction of justice; and, in my opinion, calls out for a more rapid and immediate redress than any other obstruction whatever; *not for the sake of the judges as private individuals*, but because they are the channels by which the King's justice is conveyed to the people. **

"In the moral estimation of the offence, and in every public consequence arising from it, what an infinite disproportion is there between speaking contumelious words of the rules of the court, for which attachments are granted constantly, and coolly and deliberately printing the most irrelevant and malignant scandal which fancy could suggest, upon the judges themselves, &c., &c.

"The trial by jury is one part of that system, the punishing contempts of the court by attachments is another. We must not confound the modes of proceeding, and try contempts by juries, and murders by attachment ; we must give that energy to each which the constitution prescribes."

In *Commonwealth vs. Danridge*, 2 *Virginia cases*, 409, the whole subject of constructive, or out door contempts, is thoroughly and ably discussed. In response to the position of the counsel for the defence, that the publication in question cannot be regarded as a contempt, because it referred to no cause then pending in court, but to a decision previously made, the following remarks of Judge DADE, in the case above cited, are in point."

"Upon this part of the subject, and in reference to the cases which have an indirect bearing on the present question, a dis-

tinction is attempted, for which I can find neither reason nor authority. It is said that the attaching power may be exercised for contempts touching the *prospective* conduct of the judge, but not for such as touch his past conduct. In reason, I see but one pretence for this distinction; threats and menaces of insult, or injury to a judge, in case he shall render a certain judgment, may be considered as impairing his independence and impartiality in the particular case to which the threats refer. And if the power of punishment stop here, a curious consequence may ensue. A man may be attached for *threatening* to do that for which he could not be attached, when actually done. One says of a judge, ." if he render a certain judgment against me, I will insult or beat him." For this he may be attached. But if (the judgment having been rendered,) the insult be actually offered, an attachment no longer lies; because the contempt is in relation to the past conduct of the judge, and to a case no longer pending. A recurrence to original principles, the only true test, by demonstrating that the weight, authority, and independence of the court may be equally assailed either way, will prove that this distinction is merely ideal."

In this case, the judge being about to enter the court-house for the purpose of opening court, Dandridge, standing at the door, grossly insulted him, charging him with *corruption* and *cowardice* in delivering an opinion in a cause at a previous term of the court, in which Dandridge had some interest. Proceedings for contempt having been instituted against him, the case was adjourned to the general court of Virginia, on account of its importance, novelty and difficulty; and after full discussion, the conduct of defendant toward the judge was held to be punishable as a contempt.

Had he published the charge of *corruption*, &c., which he made to the face of the judge, in a newspaper, no one can doubt but that the offence would have been aggravated.

The cases above cited (and many more might be cited, if deemed at all necessary,) abundantly show that, by the common law,

courts possessed the power to punish, as for contempt, libelous publications, of the character of the one under consideration, upon their proceedings *pending or past*, upon the ground that they tended to degrade the tribunals; destroy that public confidence and respect for their judgments and decrees, so essentially necessary to the good order and well being of society, and most effectually obstructed the free course of justice.

We have above stated that when the Supreme Court was created by the constitution, and certain judicial powers conferred upon it, the power to punish contempts of its authority, was impliedly given to it, as a necessary incident to the exercise of its express powers.   Otherwise, it would have been powerless of self-preservation, and unable to fulfill the useful purposes of its creation. The question now recurs, is there any feature in the constitution, or in the character of our free institutions, which denies to this court the power to punish, as for contempt, libelous publications however flagrant, and however much they may tend to degrade its authority, and destroy public confidence in the integrity of its judgments and decrees?   In others words, can it punish no act as a contempt, which is not enumerated in the letter of the statute, for this is the broad issue tendered by the defendant's plea to the jurisdiction in this case?   This question was left open in the case of *Neil vs. The State.*   See *p.* 269.

Such limitation upon the power of the court, is not to be found in the provision of the Bill of Rights, guaranteeing the right of trial by jury, because we have seen that this right existed at common law, by immemorial usage, in harmony with the power of the courts to punish for contempts by attachment, each applying to its appropriate class of cases ; and in *Neil vs. The State* it was expressly held, that this provision of the constitution did not take away from our courts the power to punish for contempts in a summary mode.

The only provisions to be found in our constitution, on the subject of contempts, are as follows :

"Each house may determine the rule of its proceedings, punish

its own members for disorderly behavior; and, with the concurrence of two thirds of the members elected, expel a member," &c.  *Sec.* 16, *art.* 4.

" Each house may punish, by fine and imprisonment, any person, not a member, who shall be guilty of disrespect to the house, by any disorderly or contemptuous behavior in their presence, during their session ; but such imprisonment shall not extend beyond the final adjournment of that session."  *Sec.* 17, *ib.*

These provisions are not to be regarded as a grant of power to the two houses to punish contempts, because they would have impliedly possessed such power without the grant; (2 *Story on the Const.*, *sec* 1503,) but, by the rules of interpretation, usually applied to such instruments, these provisions must be regarded as a limitation upon such power ; and under the rule that the expression of one thing excludes another, it is perhaps safe to state, that the two houses would not possess the power to punish, as for contempt, the authors of libelous publications upon their proceedings.

Had the framers of the constitution inserted in it, a provision similar to the one last above copied, in relation to the courts, the question now under discussion would be at an end.

But the fact that the convention, which framed the constitution, had the subject of contempts before them, placed a limitation upon the power of the two houses to punish contempts, but did not think proper to place any such limitation upon the power of the courts, warrants the conclusion that the courts were left to exercise such common law powers on the subject, as, in their sound discretion, might be found necessary to preserve their authority, and enforce their legal process, orders, judgments, and decrees, without which they could not answer the purposes of their creation.

And there is a good reason why the framers of the constitution might well have made this distinction.   The legislature is a political body.   If its proceedings, and the conduct and motives of its members are unjustly assailed by libelous publications, they

may defend their official conduct, and repel attacks through the press, and upon the *"stump,"* but it is not the usage of the country, nor would it comport with the dignity of judicial stations, for judges to resort to newspapers, or the public forum in defence of the integrity of their decisions, &c., and it would be an unwise policy that would drive them to such a course.

Moreover, the fact that judges of this country, or the one from which we have derived the great body of our laws, and the forms of our judicial proceedings, have in the rarest instances abused the power of punishing contempts, furnishes an additional reason why the framers of the constitution did not deem it necessary to make any express limitation upon the power. The delicacy of the power is a safe - guard against its abuse in the mind of any man worthy of a seat upon the bench.

The counsel for the defence supposed that the power of the courts to punish, as for contempt, the publication of libels upon their proceedings, was cut off by the *7th sec.* of the *Bill of Rights*, which is in these words: "That printing presses shall be free to every person; and no law shall ever be made to restrain the rights thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man: and every citizen may freely speak, write and print on any subject—*being responsible for the abuse of that liberty."*

The last clause of the section, *"being responsible for the abuse of that liberty,"* is an answer to the argument of the learned counsel.

It is a well known fact, that the *bench* and the *bar* have been, in this, and all other countries where the law has existed, as a distinct profession, the ablest and most zealous advocates of liberal institutions, the freedom of conscience, and the *liberty of the press;* and none have guarded more watchfully the encroachments of power on the one hand; or deprecated more earnestly tendencies to lawless anarchy and licentiousness on the other. The freedom of the press, therefore, has nothing to fear from the bench in this State. No attempt has ever been made, and we

may venture to say, never will be, to interfere with its legitimate province, on the part of the judiciary, by the exercise of the power to punish contempts.

The object of the clause in the *Bill of Rights* above quoted, is known to every well informed man. Although the press is *now* almost as free in England as it is in this country, yet the time was, in by-gone ages, when the ministers of the crown possessed the power to lay their hand upon it, and hush its voice, when deemed necessary to subserve political purposes. A similar clause has been inserted in all the American constitutions, to guard the press against the trammels of political power, and secure to the whole people a full and free discussion of public affairs.

Any citizen has the right to publish the proceedings and decisions of this court, and if he deem it necessary for the public good, to comment upon them freely, discuss their correctness, the fitness or unfitness of the judges for their stations, and the fidelity with which they perform the important public trusts reposed in them, but he has no right to attempt, by defamatory publications, to degrade the tribunal, destroy public confidence in it, and dispose the community to disregard and set at naught its orders, judgments, and decrees. Such publications are an abuse of the liberty of the press, and tend to sap the very foundation of good order and well being in society, by obstructing the course of justice. If a judge is really corrupt, and unworthy of the station which he holds, the constitution has provided an ample remedy by *impeachment* or *address*, where he can meet his accuser face to face, and his conduct may undergo a full investigation. The liberty of the press is one thing, and licentious *scandal* is another. The constitution guarantees to every man the right to acquire and hold property, by all lawful means, but this furnishes no justification to a man to *rob* his neighbor of his lands or goods.

The remarks of Chief Justice McKEAN, in *Respublica vs. Oswald*, above referred to, are in point. He said: "What then is the meaning of the *Bill of Rights*, and the constitution of Pennsylvania, when they declare: 'that the freedom of the press shall

not be restrained, and that the printing press shall be free to every person who undertakes to examine the proceedings of the Legislature, or any part of the government?' However, ingenuity may torture the expressions, there can be little doubt of the just sense of these sections; they give to every citizen a right of investigating the conduct of those who are entrusted with the public business; and they effectually preclude any attempt to fetter the press by the institution of a *licenser*. ** But is there anything in the language of the constitution (much less in its spirit and intention,) which authorizes one man to impute crimes to another, for which the law has provided the mode of trial and the degree of punishment? Can it be presumed that the slanderous words, which, when spoken to a few individuals, would expose the speaker to punishment, become sacred by the authority of the constitution, when delivered to the public through the more permanent and diffusive medium of the press? ** The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society, to enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame. To the latter description, it is impossible that any good government should afford protection and impunity."

The argument of counsel that the constitution and laws having provided for the punishment of libels by indictment, renders it wholly unnecessary for the courts, in any instance, to treat them as contempts, as well remarked by the Attorney General, if it proves anything, proves too much; because, if a man resist the process of a court, or enter the court-house and assault the presiding judge, he may be punished by indictment therefor, and yet no one questions the power and duty of the court to punish such acts as contempts.

After the impeachment of Judge PECK, Congress passed an act restricting the power of the courts of the United States in the pun-

ishment of contempts, and intended, doubtless to deprive them of authority to treat out-door publications of any character as such. See *4th Statutes at Large*, 487. This act was approved 2d March, 1831. In *United States vs. Holmes, Wallace Reports* 1, Mr. Justice BALDWIN, presiding in the Circuit Court of the United States, correctly remarked that the act of Congress referred to, was a limitation upon his power to punish contempts.

The judicial power of the United States is vested in one Supreme Court, and in such inferior courts as the Congress may, from time to time, ordain and establish. *Constitution of United States, art.* 3, *sec.* 1. The Supreme Court was created by the constitution, the district and circuit courts by acts of Congress. When the latter were established, and vested with certain judicial powers, the authority to punish contempts attached as an incident. 2 *Story on the Constitution, sec.* 1774. But deriving their existence from Congress, it follows that their power to punish contempts is under its control.

The act above referred to, however, applies, in its terms, to all the courts of the United States, but whether the Supreme Court, deriving its existence and powers from the constitution, has regarded the act as an imperative limitation upon its authority to punish contempts, we have no means of determining, finding no adjudications upon the point by it. Perhaps the Supreme Court has acquiesced in the act, through that respect due to the Legislative will, without inquiry into the question of power. It may be said, to the credit of the press in this country, that it has generally upheld and maintained respect for the judiciary, and instances of libelous publications upon the courts have rarely occurred.

The case of Judge PECK is familiar to the profession. Presiding in the District Court of the United States, for the district of Missouri, in the year 1826, and having decided one of several important land cases pending before him, he published his opinion in the cause. Mr. *Lawless*, an attorney of the court, and engaged in the cases, published a criticism upon the opinion, not

impugning the motives or charging corruption upon the judge, but discussing the correctness of his decision, and pointing out what he deemed to be its errors. The judge treated the publication as libelous, and punished its author as for contempt of court, on the grounds that it tended to prejudice the determination of the remaining causes. Mr. *Lawless* complained to the House of Representatives of the Congress of the United States, of the conduct of the judge, and finally he was impeached for an official misdemeanor; and, on full discussion of the law of contempts, acquitted by the Senate upon a close vote. The impression generally prevailed, however, that Judge PECK exceeded his authority, and this doubtless lead to the passage of the act of Congress above referred to.

But we may venture to remark, that independent of any statutory provisions upon the subject, the distinction between the constitutional freedom, and licentious abuse of the press, is now so well understood in this country, that no American judge would consider himself authorized to punish, as for contempt, authors of publications of the character of that made by Mr. *Lawless.*

A number of the States have passed acts, similar to the one enacted by Congress, and not unlike our own statute, on the subject of contempts, but there are to be found but few adjudications upon them.

The case of *Ex parte Hickey,* to be found in an appendix to 4 *Smed. & Marsh. Rep.,* has been cited by the counsel for the defence. In this case, a gross libel was published upon the presiding judge of Warren Circuit Court, charging him with disregarding his official oath; of officially favoring the escape of a man charged with murder in the court in which he was at the time presiding, and of being a criminal abettor of the accused. The newspaper containing the publication, was printed and circulated in the midst of the community where the cause was to be tried. The judge fined and imprisoned the author of the libel as for contempt of court; he was pardoned and released by the Governor of Mississippi, on the ground that the offence was not

embraced by the statute of contempts; the judge deeming his constitutional province invaded by the pardon, issued a bench warrant for the re-commitment of Hickey, who applied to Mr. Justice THATCHER, one of the judges of the Supreme Court, in vacation, to be released on *habeas corpus*, and was set at liberty. The learned judge concedes that according to the doctrine of the English, and some of the American courts, Hickey was guilty of an undoubted contempt, of [an aggravated character; but when *"tested by the crucible of the constitution*, (of Mississippi,) it was a mere libel upon the functionary, subjecting the party to indictment.

We must be permitted to say, with all due respect for the learning and ability of Judge THATCHER, that so far as he is understood to hold, that the power of the courts to punish contempts is derived from statute, he is at war with the whole current of both English and American decisions and commentators, so far as we have had access to the books; and in sustaining the pardoning power of the Governor in cases of contempt, he is directly at variance upon principle with Judge STORY.    *Com. on Constitution,* sec. 1503.

Judge THATCHER supposes that no libel upon the official acts of the judge, however flagrant, can obstruct the exercise of the constitutional powers of a court, and defeat the full and free administration of justice, in a manner to be treated as a contempt.

If an ignorant, or impolite man stalks into a court-house with his hat on, or makes a noise about the door, or disobeys process, all agree that he may be punished for contempt; but if a man has an important cause pending in court, and willing to resort to desperate measures to succeed, publishes, on the eve of the trial, a libel, alleging that the judge has been bribed to charge the jury against him, and that all the witnesses, who are to appear on behalf of the opposing party, have been corrupted, and are unworthy of credit, it is no contempt, and the judge must labor under the embarrassment of sitting in the case, under such circumstances, with his mouth closed!   Or if a judgment is rendered against

a man, as soon as the judge leaves the bench, he is met at the door, insulted and assaulted by the party, in consequence of his decision, and then a publication is made in a newspaper charging him with corruption in rendering the judgment, and calling upon the community to disregard, and resist its execution, and yet this is no contempt!

These cases are put by way of illustration; they may be extreme, yet they may occur, and when we are called upon to declare, in effect, that the courts have no power to punish any act as a contempt, which is not enumerated in the statute, as we now are by the defendant's plea, it is well to anticipate the results that may flow from such decision.

In *Stuart vs. The People*, 3 *Scammon* 395, the contempt charged against the printer of a newspaper, consisted in an article remarking upon the conduct of an individual juror, while under the charge of an officer, and in the admission of a communication from a correspondent, calculated to irritate, but in no way *reflecting upon the integrity, or impeaching the conduct of the Circuit Judge.* The Supreme Court of Illinois, properly, no doubt, held that the liberty of the press had not been abused by these publications, and that the printer was guilty of no contempt. The remarks of Mr. Justice BREESE, when applied to the facts of the case before him, are appropriate.

In *Morrison vs. Moat*, 4 *Edw. Chan. Rep.* 25, any intentional contempt and disrespect towards the court were disavowed, though the decision of the court was misrepresented; and the point decided by the chancellor, was that the publication did not come within the provision of the statute providing for the punishment, as for contempt, of the publication of a false, or grossly inaccurate report of the proceedings of the courts. The constitutional power of courts to punish contempts, is not discussed or referred to.

It may be remarked, that though our statute above copied (*Dig.*, *chap.* 36, *sec.* 1,) declares that courts of record shall have power to punish, as for contempt, the acts therein enumerated, *and none*

*others;* yet, at the same session it was declared, that a person attempting to practice law without being licensed, sworn, and registered, should be punished, as for contempt, (*Digest, chap.* 19, *sec.* 7,) and that a clerk failing to return a writ of error, should be deemed guilty of a contempt of this court, (*Digest, chap.* 127, *sec.* 22,) though this was clearly embraced within the general statute, being disobedience of process. And though the general statute (*section* 2,) declares that the fine for contempt shall, in *no case, exceed fifty dollars,* and the imprisonment *ten days;* yet at the same session it was enacted, that courts should have power to fine a person, summoned as a witness, and failing to appear and testify, not exceeding *one hundred dollars,* and to imprison a witness refusing to testify, *until he give evidence as required. Digest, chap.* 171, *sec.* 6, 7. It may be inferred from the unharmonious character of this legislation, that the several provisions on the subject of contempts, contained originally in the *Revised Statutes,* were copied from the statutes of other States, by the *revisers,* and adopted by the Legislature without careful consideration of the whole subject of legitimate contempts.

In the *Matter of Lawson, sheriff,* 3 *Ark. Rep.* 363, the sheriff of Pulaski county was held to be guilty of a contempt of this court, for neglecting to be present at its sitting, and discharge the duties imposed upon him by law, but there is no statute making this a contempt.

It was remarked by counsel, that if the courts could, in any instance, go beyond the provisions of the statute, their power to punish contempts would be undefined and unlimited. But such is not the case. One hundredth part, perhaps, of the great body of laws, by which our people are governed, is not embraced in our statutes. Crimes are punished, wrongs redressed, and rights enforced by such principles of the common law as are consistent with our constitution, the character of our liberal institutions, and sanctioned by the adjudications of our courts. No provision of the common law is enforced here, however, which is in conflict with our statutes, unless it was expressly or impliedly adop-

27B

ted by the constitution. For example, the bill of rights declares, "that the right of trial by jury shall remain inviolate," (*sec.* 6), and the word "*jury*" has been held to have been used in its common law sense, meaning *twelve men*, and the Legislature cannot abridge the number. *State vs. Cox*, 3 *Eng.* 436. So the terms "indictment" and "presentment" are used in the 14th section of the bill of rights, in their common law sense, and the Legislature cannot dispense with a grand jury in their preferment. *Ib.*, and *Eason vs. The State*, 6 *Eng. Rep.* 481. So it is manifest that the Legislature cannot deprive the courts of such common law power to punish contempts as is impliedly conferred upon them by the constitution. And in passing upon the validity of such statutes, the courts must necessarily determine whether their legimate constitutional powers are abridged thereby, being careful never to declare an act unconstitutional unless it is manifestly so.

It was well remarked by counsel, that no court could coerce public respect for its decisions; and we may add that no sane judge would attempt it. If it were the general habit of the community to denounce, degrade, and disregard the decisions and judgments of the courts, no man of self-respect and just pride of reputation would remain upon the bench, and such only would become the ministers of the law, as were insensible to defamation and contempt. But happily for the good order of society, men, and especially the people of this country, are generally disposed to respect and abide the decisions of the tribunals ordained by government as the common arbiters of their rights. But where isolated individuals, in violation of the better instincts of human nature, and disregardful of law and order, wantonly attempt to obstruct the course of public justice, by degrading and exciting direspect for the decisions of its tribunals, every good citizen will point them out as proper subjects of legal animadversion.

A court must naturally look first to an enlightened and conservative bar, governed by a high sense of professional ethics, and deeply sensible, as they always are, of its necessity to aid in

the maintenance of public respect for its opinions. For whatever impulsive remarks counsel may make, in the moment of disappointment of success, prompted by commendable zeal for their clients, and a laudable ambition, and however sincerely they may think the court has erred, yet, upon reflection, they fail not to exert their influence to preserve public respect for the tribunal.

Next to them, the court looks to the sober judgment of all reflecting and intelligent men, and to none with more confidence than the enlightened and liberal conductors of the press, who, as before remarked, have generally manifested a disposition to maintain public respect for the judicial tribunals of the country.

The counsel for the defence remarked that the publication in question was made in an obscure paper, in a moment, perhaps, of inadvertence; that by the unskilful construction of its sentences, its author is made to say more than he meant; that it produced no effect upon the public mind, tending to degrade this court and destroy confidence in the integrity of its decisions; and, therefore, could not be treated as a contempt. All this may be true, and would be duly considered if it came up in the form of a response to the summons; but upon the plea to the jurisdiction of the subject matter, we cannot look beyond the face of the article, and the natural effects of such publications upon the public mind.

Sensible of the delicate position occupied by a court when passing upon the scope of its own judicial powers, and especially in a case like the one before us, and adhering to the repeated decisions of this court, that an act of the General Assembly should never be declared unconstitutional unless it is manifestly so, we are nevertheless not prepared to decide, in advance, that this court may in no case, however flagrant, find it necessary to go beyond the provisions of the statute, in order to preserve and enforce its constitutional powers, by treating, as contempts, acts which may clearly invade them.

The counsel for the defence having discussed this important,

and fortunately for the honor of the State, novel question, with the utmost respect for the delicate position occupied by the court, we have endeavored to respond, not by mere *ipse dixit*, but with argument and authority, which must be an apology for the length of this opinion.

It remains but to announce the conclusion, already indicated, that the demurrer to the plea is sustained, and the defendant privileged to answer further.

---

(AT THE JANUARY TERM, 1856.)

Upon sustaining the demurrer to the plea, at the July term, 1855, this case was continued with leave to the defendant to file a response to the charge of contempt. The response having been filed, the case was submitted and the rule discharged.

Mr. Chief Justice ENGLISH said : The defendant, availing himself of the privilege allowed him to answer further, has filed a response to the rule, upon his oath, in which he expressly states, that he did not intend the intimation of bribery made in the publication complained of, to apply to this court or its judges, but to other persons. In confirmation of the truth of this statement, he declares, that he published in his paper, of the 7th April, 1855, and before the rule was issued against him in this case, an editorial paragraph, in which he stated that he did not intend that portion of the article of the 24th March, making the intimation of bribery, to apply to the Supreme Court, but that it was intended for another point of the compass, &c. This explanatory para-

graph is copied in the response.  He positively denies all intention to commit a contempt by the publication of the article in question, &c.

The Attorney General suggested, that upon any reasonable interpretation of the language used in the publication supposed to have been libelous, it was not in harmony with the truth of the response.

In response to this we have only to remark that the attention of the court having been directly called to the publication, by a member of the bar, we felt it incumbent upon us, as remarked in the opinion heretofore delivered, to take some notice of the matter, and to enquire into the constitutional power of the court to punish in such cases, as for contempt.  Having accomplished this purpose, we are not disposed to take further notice of the matter.

The response being upon oath, we shall treat it as true, and the rule will be discharged.