[No. 645.   December 20, 1895.]

# IN THE MATTER OF CONTEMPT v. THOMAS HUGHES AND W. T. McCREIGHT, RESPONDENTS.

CONTEMPT OF COURT—NEWSPAPER PUBLICATION—PUNISHMENT.—In a proceeding for contempt against the publishers of a newspaper for the publication therein of an article attributing improper motives to the members of the supreme court in the institution of a disbarment proceeding then pending, the publisher and editor of such paper may be summarily punished by the court for contempt, by imprisonment, for such publication, made with his knowledge, although he may disclaim any intention of reflecting upon the court, or any of its members.

PROCEEDING for contempt.  Respondent, Thomas Hughes, found guilty, and sentenced to imprisonment in the Bernalillo county jail for sixty days; COLLIER, J., concurring; SMITH, C. J., in the result; and BANTZ and HAMILTON, JJ., dissenting from punishment inflicted, in separate opinions filed.

The facts are stated in the opinion of the court.

W. B. CHILDERS, A. A. JONES, and JOHN P. VICTORY for the territory.

EDWARD L. BARTLETT for respondents.

LAUGHLIN, J.—The respondent was attached upon an affidavit and information made by W. B. Childers, a member of a committee appointed by this court, to prepare and prosecute charges against Thomas B. Catron and Charles A. Spiess for alleged unprofessional conduct in the trial of the case of the territory of New Mexico against Francisco Gonzales y Borrego et al., for the murder of Francisco Chavez, which was tried in the district court for the county of Santa Fe, in the month of May, 1895.  Jacob H. Crist, the district

attorney, represented the territory in the trial of that case. At the July, 1895, term of this court, the said Crist, as district attorney, filed his own affidavit and copies of portions of the testimony taken upon the trial of said cause, and also the affidavit of several other persons, in which it was alleged that the said Thomas B. Catron and Charles A. Spiess had been guilty of efforts to procure false affidavits from the witnesses and otherwise improperly affect the testimony of the witnesses in that case. Upon the filing of said affidavits by the said district attorney, this court appointed John P. Victory, A. A. Jones, W. B. Childers, S. B. Newcomb, and B. S. Rodey, all prominent members of the bar of this territory, to inquire into the alleged offenses, and to prepare and file proper charges against the said Catron and Spiess, if, in their judgment, it should be deemed necessary, and present them to this court, and to procure such evidence as they thought proper, and submit the same to the court, in order that there might be a full investigation of the charges so made against the said respondents, Catron and Spiess.

After the committee had filed such charges, and the hearing upon same had been fixed by the court, while they were pending and undisposed of in this court, there was a publication in the Daily Citizen, a newspaper published at Albuquerque, in the county of Bernalillo, of an article nearly three columns in length, entitled "Is it Honesty or Partisanship?" The following are extracts from said article: "Last Sunday evening, Chief Justice Smith, of the supreme court of this territory, wired W. B. Childers that he intended to spend the night with him 'in this city. It has been reliably ascertained that the object of his visit to Albuquerque, outside of his own district and away from Santa Fe, the seat of the supreme court, was to consult with Childers, one of the attorneys designated to 'formulate' charges against T. B. Catron, based on infor-

mation in the nature of affidavits and copies of a part
of the evidence in the First judicial district court, in
the case for the murder of Chavez, presented by J. H.
Crist.  Judge Smith, notwithstanding the fact that he
is a member of the supreme court, and as such one of
the judges to hear and try such charges, has, contrary
to all precedent, delicacy, and the ethics pertaining to
the judicial action, descended from the high position
which he should have commanded, so as to appear in
the partisan effort to ruin the character of an attorney
whose only crime is that he was, at the last election,
selected by a majority of about three thousand votes to
represent New Mexico in congress.  In his zeal to crip-
ple the influence of Catron to aid New Mexico and her
people, Judge Smith has made this visit to Albu-
querque, and at the residence of Childers took up nearly
the whole night in discussing the case and its merits.  It
is well understood that, prior to any action taken in the
supreme court in this matter, Judge Smith also met and
had a full consultation with Childers, Crist, and other
attorneys, who were at enmity with Catron, in regard
to the propriety and feasibility of pushing the cause
against Catron; that it was there determined that it
was necessary to push them for political and personal
reasons; that Judge Smith would see that they were
referred to a special committee of the bar, composed of
a majority who would be hostile to Catron, either
politically or personally, or both, but that it should be
so done that it should be made to appear to the other
members of the supreme court that it was intended to
be nonpartisan.  *  *  *  We do not desire or intend
to reflect on the supreme court or any member of it,
only to state the facts as we have heard them, for the
information of the public.  We do think, however, the
action of Judge Smith was very reprehensible.  He
had no more occasion to consult with a member of that
committee in advance than he had to become the prose-

cutor in that or any other cause which might come before him in the supreme court or the district court. He sits as a juror. Having taken an active part in advising in regard to the cause,—having manifested his prejudice, if we are correctly informed,—he is no longer qualified in that case. Yet, if appearances and reports are true, he has not demeaned himself as a fair, upright, and manly judge should have done. No judge having any regard for his office or for the esteem for his fellows, since the time of Bacon and Jeffreys, has ever allowed himself to be consulted or to take part in advising the course to be pursued in a given case. The management of causes, and the propriety of the course to be pursued, and the accusation to be presented in any case, should be left to the legal profession, and, in a case like this, to the Bar Association of New Mexico, of which Catron and Spiess are both members, and where such matters properly belong. It can scarcely be considered that Judge Smith has acted fairly and impartially in this cause if the facts as we learn them be true. The other members of that court should see that the judicial ermine is not dragged in the mud of politics and of personal enmity, and should promptly check any partisan zeal or political hostility which may be manifested in that cause if there be any display thereof.   *   *   *   Why does the supreme court assume to take control and ignore the bar association, of which each member of the court is a member? Why is the grievance committee of that association composed of such men as N. B. Field, George W. Knaebel, S. B. Newcomb, Frank Springer, and A. A. Jones, ignored? Are not these men capable of looking into the truth and reasonableness of the charges? These are men whose integrity, ability, and fairness can not be questioned, unless it be by those who seek to perpetrate a wrong. It is no partisan committee. Three of its members are democrats, and two

republicans. Two of them, Newcomb and Jones, have been placed on the committee to formulate these charges. But Field, Knaebel, and Springer have been shoved aside, Field being chairman. Instead of three such men as Field, Knaebel, and Springer, Victory, Childers, and Fiske, persons either politically or personally hostile to T. B. Catron, were placed on the committee. Why was this? Was it fair, or was it that they did not believe in the honesty, integrity, and fairness of Springer, Knaebel, and Field? Or was it, possibly, in order that the advocates of certain peculiar ideas should go upon the committee to besmirch the character of other members of the bar? We hope the latter is not the case. We believe it is not; but, if it be such, then to what low, contemptible, degraded, and insignificant place can the judiciary descend.   *   *   * The individual who penned or inspired that article, or both, and every one else who knows anything, knows the members of the supreme court individually never read over the alleged charges and annexed papers presented by Crist, nor have they heard them read over, but, without reading or hearing them read, referred them to the representation of some one of the committee, with instructions simply to formulate charges based thereon, but not to examine into the truth of the facts or the probability of their correctness. It is further well known that Catron's attorneys applied to the court on motion, and asked to have the charges investigated by the committee, and their powers enlarged for that purpose, so that they might determine whether there was any reasonable foundation for preferring charges. The supreme court refused to accede to this motion. That thereafter the committee itself applied to the court, and requested to be informed as to their duties, and most, if not all, of the committee stated that if they were required to examine into the facts of the charges, or do anything except to act ministerially

in formulating charges upon the supposed facts before them, that they declined to act upon the committee. They were therefore informed by the court that they were to formulate charges upon the matters presented to them, and stand between the court and wrong. What that meant does not seem to be very clear. These facts, although done in private, with closed doors, none present but four members of the court and the committee, have reached the light of day. How can it be said that the court or any committee has in any manner passed upon the correctness of the charges or the possibility of sustaining them. No investigation has been made by either. Why were not these charges preferred in the district court, where the facts complained of are said to have happened, if at all, and that also before Judge Hamilton? * * * We do not write these facts to influence the supreme court. We expect to be governed solely and entirely by the merits of the case. We do demand, however, that the case shall be tried according to law; that a proper weight should be given, in view of all the facts and surroundings, to the testimony of each witness. We do demand that politics shall be eliminated; that personal hostility and enmity shall be set aside, and nothing but the strictest kind of justice and honesty shall prevail."

The information against said Hughes states that he and one W. T. McCreight are partners, under the name of Hughes & McCreight, and the proprietors of said paper, and has attached to it a copy of said article, alleging that the same was published by the said Hughes & McCreight in said newspaper, which had a general circulation in the territory of New Mexico and in Santa Fe, the capital of said territory, where this court was then in session, and about to proceed to the investigation of the said charges against the said Catron and Spiess. Upon the filing of said information, a writ of attachment was issued for the appre-

hension of the said Hughes & McCreight. Said
McCreight was attached and brought before the court,
and to him certain interrogatories were submitted, to
which he filed answers; and thereupon the court fined
the said McCreight in the sum of $25 and costs of the
proceeding. It appeared from the answers of said
McCreight that he had no personal knowledge of the
publication of the said article, or that it was to be pub-
lished until it appeared in said newspaper, and that he
was more immediately connected with the local work
on said paper than the editorial department.

It appears from the marshal's return and otherwise
that, upon issuance of said attachment, the said
respondent Hughes fled from the territory of New
Mexico, and was apprehended by the United States
marshal at the town of Winslow, in the territory of
Arizona, and brought back, and presented before the
court in the custody of the marshal. Certain inter-
rogatories were submitted to said Hughes, and answered
by him, some of which, together with his answers, are
as follows: "Ans. 12. The article was found, as I
have stated, upon my office desk. It was typewritten
and unsigned. I read it very hurriedly; hung it on
the copy hook; and, as I was extremely busy on that
day, I sent the article in 'takes' to the printers, and did
not read the article until the proof sheets came down;
and then, in the hurry of the day, it was placed on the
editorial page in making up the forms. I did not read
all the proof. W. S. Burke read a portion, and I read
a portion; and I never read the entire article until after
it was printed in the paper. I had no knowledge or
information at that time or since of the authorship of
the article. Int. 13. Did not W. S. Burke, who is
employed as a writer on said newspaper, when reading
a part of the proof of said article above referred to,
state to you, in substance or effect, that said article
was 'loaded,' meaning that it was libelous, and that it

was calculated to get you or the paper in trouble? Ans. 13. He did, in substance, and he changed one sentence in the article at his suggestion.''

Respondent further states on his oath that at the time the United States deputy marshal came to where he was stopping at the hotel in Winslow, Arizona, respondent did not ask for his authority nor demand to see any warrant, but voluntarily went with said marshal to the train, and returned to New Mexico; and that, after arriving within the limits of said territory, said deputy marshal read to respondent the warrant which has been returned into this court. And respondent further states, upon oath, that, in the publication of the article referred to, he had no intention or desire to reflect upon the supreme court of the territory of New Mexico, its chief justice, or any member of said court, nor any intention or desire to impede or obstruct the course of justice in any cause or matter pending before it; and that if respondent had read the article in question with care before it was published, or had been aware of the character of its contents, the same would not have been published in said newspaper, and respondent deeply regrets that, by reason of his haste, such a publication should have appeared in his paper, on October 17, 1895.

After the answer had been filed, and the case heard, and the judgment rendered, but before the sentence of the court had been pronounced, the respondent published in his paper a retraction, which is as follows, to wit:

''An article appeared in the Daily Citizen on the ninth day of this month reflecting on Chief Justice Smith, of the territorial supreme court. Investigation shows that the article was false in many particulars. The article appeared as an editorial, though it was not written by the editor of this paper. We are now convinced that the objectionable language referred to in

the article was fairly and reasonably open to the construction put upon it by the supreme court, though no such construction was intended or thought of by the editor of this paper when the same was published. We fully realize the importance of having the courts of justice unimpeded by newspaper articles or criticism reflecting upon the character of the court or any member thereof. We wish to reiterate our regret that said publication should have appeared, and we desire to give this public assurance that hereafter no such article shall appear in these columns. It appeared and was published through gross carelessness, and without any malicious intent on the part of the editor of this paper; and we desire in this public manner to make apology to Chief Justice Smith and the members of the territorial supreme court of New Mexico.

"Thos. Hughes,<br>"Editor Daily Citizen."

The question was argued before the supreme court as to whether the said Hughes should be punished for the publication of said article upon the answers filed by him. A majority of the court held that the answers could not be contradicted, and excluded all testimony offered for the purpose of contradicting the same, partly upon the ground that the practice did not permit the answers of the respondent in such cases to be contradicted, and partly upon the ground that the answers of said Hughes themselves showed guilty knowledge of the contents of said editorial, and that the publication thereof was admitted by him. It will be seen from an examination of said answers that the said Hughes claims that he was entirely ignorant of the authorship of the said article; that he found the same upon his table or desk in his office, and was wholly ignorant of how it came to be there; that he caused same to be set up and published in his paper without making any inquiry what-

ever into the authorship of the article, or as to the truth of the charges therein made against the chief justice and the other members of this court.

An examination of the extracts quoted above from said article, will show that it was not only a most flagrant attack upon the chief justice, but also other members of the court, and the court as a whole, charging them with dishonest and partisan purposes in the entertainment of the charges against the said Catron and Spiess, and the appointment of a committee to prosecute the same. It would be difficult to find in the proceedings of courts for contempt, or in the history of newspaper publications, a more flagrant and outrageous abuse of the liberty of the press. A more flagrant contempt of court probably never was perpetrated by the publication of a newspaper article than in this instance, and the answer of the defendant that he was ignorant of the purpose or effect of the article, and of the authorship of it, instead of mitigating his offense, aggravates it; and it is impossible to escape the conclusion that his flight from New Mexico was in consequence of the issuance of this writ of attachment for his apprehension. No other satisfactory reason has been suggested to the court for such flight.

The judgment of this court in finding the said Thomas Hughes guilty of contempt, and sentencing him to imprisonment in the jail of the county of Bernalillo for sixty days, and one dollar fine and costs, was rendered during the progress of the investigation of the charges against the said Catron and Spiess. But, deeming the questions herein involved of such importance to the public that they should be thoroughly understood, we have concluded to state what we believe to be the law concerning contempt of court committed by the publication of articles in newspapers reflecting upon judicial tribunals.

Mr. COOLEY, one of the most eminent American

jurists and writers on constitutional law, states the law as follows: "It has also been held in many cases that the publication of an article in a newspaper commenting on proceedings in court then pending and undetermined, or upon the court in its relation thereto, made at a time and under circumstances calculated to affect the course of justice in such proceedings, and obviously intended for that purpose, may be punished as a contempt, even though the court was not in session when the publication was made."

In the case of People v. Wilson, 64 Ill. 221, the supreme court of the state of Illinois, the opinion being rendered by its chief justice, says: "I merely quote the rules as laid down by Bishop, an American writer, in his work on Criminal Law (page 216). He uses the following language: 'According to the general doctrine, any publication, whether by parties or strangers, which concerns a case pending in court, has a tendency to prejudice the public concerning its merits, and to corrupt the administration of justice, or which reflects on the tribunal or its proceedings, or on the parties, the jurors, the witnesses, or the counsel, may be visited as a contempt.' Whether tested by this common law definition or by the rule laid down by this court in the case of Stuart, already cited, there is no room for doubt that the article in question must be held a contempt of flagrant character. It related to a case in court involving in its final issues a human life. The answers of the respondents state that, at the time of the publication, 'there was intense excitement in the community, and particularly in the city of Chicago, on account of frequent murders, and the escape of the perpetrators thereof.' This is no doubt true, and this article seems to have been studiously written with a view to direct popular clamor against this court, and compel it either to affirm the judgment sending Rafferty to execution, or incur the imputation of bribery, and the clamor of

an angry city to be echoed throughout the state by a portion of the Chicago press. The demand was not that we should calmly examine the record of Rafferty's trial to see whether his conviction had been legal, but that we should give him over to execution, because there was such impunity for crime in the city of Chicago that it was necessary some men should be immediately hung. We have since examined the record of this man's conviction, and reversed the judgment; all the members of the court holding that a plain provision of the statute had been violated on his trial. Let us say here, and so plainly that our position can not be misrepresented only by malice or gross stupidity, that we do not deprecate, nor should we claim the right to punish, any criticism the press may choose to publish upon our decisions, opinions, or official conduct in regard to cases that have passed from our jurisdiction so long as our action is correctly stated, and our official integrity is not impeached. The respondents are correct in saying in their answers that they have a right to examine the proceedings of any and every department of the government. Far be it from us to deny that right. Such freedom of the press is indispensable to the preservation of the freedom of the people. But certainly neither of these respondents, nor any intelligent person connected with the press, and having a just idea of its responsibilities, as well as its powers, will claim that it may seek to control the administration of justice or influence the decision of pending cases. A court will, of course, endeavor to remain wholly uninfluenced by publications like that under consideration; but will the community believe that it is able to do so? Can it even be certain in regard to itself? Can men always be sure of their mental poise? A timid man might be influenced to yield, while a combative man would be driven in the opposite direction. Whether the actual influence is on the one side or the

other, so far as it is felt at all, it becomes dangerous to the administration of justice. Even if a court is happily composed of judges of such firm and equal temper that they remain wholly uninfluenced in either direction, nevertheless a disturbing element has been thrown into the council chamber, which it is the wise policy of the law to exclude. It may be said that, as long as the court was conscious it had not been frightened from its propriety by the article in question, the wiser course would have been to pass it by in silence. So far as we are personally concerned, we should have preferred to do so. We desire no controversy with the press. But a majority of the court were of the opinion that this publication could not be disregarded without infidelity to our duty. By our relation to the bar, to the suitors in our court, to the entire judiciary of the state, and to the state itself, we felt constrained to call the persons responsible for this publication to account."

In a note of the learned editor of the American Decisions to the case entitled In Sturoc (97 Am. Dec. 630), the following will be found: "Publications in Newspapers as Contempts. It has long been settled, and is now generally acknowledged, that certain publications in newspapers may amount to contempts of court, and may be summarily punished as such. Publications pending a suit, reflecting on the court, the jury, the parties, the officers of the court, or attorneys with reference to the suit, and having a tendency to influence the action of the tribunal before which the case is pending, are a contempt of that court, which may be summarily punished by attachment if the publication has a tendency to prejudice the public, a part of whom may thereafter be summoned as jurors, with respect to the merits of a case pending in the courts, and to corrupt the administration of justice. Publications scandalizing the court, and intended to unduly influence and overawe its deliberations in causes pend-

ing, are contempts, which this court is authorized to punish by attachment; and it is essential to the dignity of character, the utility, and independence of the court, that it should possess and exercise such authority." People v. Wilson, 64 Ill. 221. To the same effect: Hollingsworth v. Duane, Wall. Sr. 77 Fed. Cas. No. 6616; Bronson's Case, 12 Johns. 460; State v. Morrill, 16 Ark. 384; Respublica v. Passmore, 3 Yeates, 441, 2 Am. Dec. 388, and note; Respublica v. Oswald, 1 Dall. 319; Stuart v. People, 3 Scam. 405.

In treating of this subject, Mr. Bishop says: "Again, according to the general doctrine, any publication, whether by parties or strangers, relating to a cause in court, tending to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice, or reflecting on the tribunal or its proceedings, or on the parties, the jurors, the witnesses, or the counsel, may be visited as a contempt." 2 Bish. Cr. Law, sec. 259; In re Cheltenham, etc., Ry. Carriage & Wagon Co., L. R. 8 Eq. 580; Daw v. Eley, L. R. 7 Eq. 49; Littler v. Thomson, 2 Beav. 129; In re Crawford, 13 Jur. 955; Reg. v. Onslow, L. R. 9 Q. B. 219, 12 Cox, Cr. Cas. 358, 5 Eng. Rep. 443; Reg. v. Skipworth, L. R. 9 Q. B. 219, 5 Eng. Rep. 456; Reg. v. O'Dogherty, 5 Cox, Cr. Cas. 348; Anon., 2 Atk. 469.

In State v. Morrill, 16 Ark. 399, the court goes further, and says: "The cases above cited (and many more might be cited if deemed at all necessary) abundantly show that, by the common law, courts possessed the power to punish, as for contempt, libelous publications of the character of the one under consideration, upon their proceedings pending or past, upon the ground that they tended to degrade the tribunals, destroy the public confidence, and respect for their judgments and decrees, so essentially necessary to the good order and well-being of society, and most effectually obstructed the free course of justice." Applying these

principles, the supreme court of appeals of West Virginia, in a late case, held that a publication in a newspaper where the court was sitting, with reference to a case then pending and undetermined, charging three of the four judges of the court with having attended a political caucus more than a year before, and in the caucus advising the action out of which the case arose, and promising the caucus to hold its action legal and proper, and charging the court with having agreed to decide the case before an approaching political convention for political purposes, was a contempt of that court which they should summarily punish. State v. Frew, 24 W. Va. 416. So, where a number of the members of the bar unite in a publication falsely charging the judge of the supreme court with having improperly participated in politics, and insinuating that they would favor their fellow partisans in their judicial deliberations, they are guilty of such contempt as justifies their suspension from practice, until they purge themselves of it. Ex parte Moore, 63 N. C. 397. Tenney's Case, 23 N. H. 162, affords another illustration of this rule.

Among the more recent cases where the publication of such articles in newspapers has been punished as contempt of court is Burks v. Territory (decided by the supreme court of Oklahoma, on September 7, 1894), 37 Pac. Rep. 829. In that case it was decided that the power to punish for contempt is inherent in courts of record; that the legislature has no power, in the absence of constitution provisions, to limit or regulate the inherent powers of the courts to punish for contempt; and that the party accused has no right of trial by jury in a contempt proceeding. The court has also decided that the United States statute of March 2, 1831, which is embodied in section 725 of the Revised Statutes of the United States, limiting the power of the courts of the United States to inflict summary punishment for

contempt of court, is not applicable to the courts of the
territory, these courts not being courts of the United
States to which these provisions of the acts of congress
are applicable. The court decided in that case that
publications made in a daily newspaper, while a matter
is pending in the court, as to whether or not a certain
report presented by the grand jury shall be received by
the court, or returned to the grand jury for further
proper action and corrections, to the effect that the
action of the judge seemed to indicate that he intended
to withhold the report, and that, if the judge per-
sisted in carrying out such intention by suppressing the
report of the grand jury, the act might be character-
ized as a flagrant violation of the people's rights, and
charging by direct implication that the action of the
court is "an effort to browbeat the grand jury, and an
effort to bend the grand jury to the will of the judge,"
and "a serious matter," constituted a contempt of
court. In the opinion it is said: "Such conduct is
often overlooked by the courts, when the acts are seri-
ous injury to the public. The diffidence of courts to
take up for investigation and punishment matters
which are aimed, not only at the court in its public
capacity, but also in its individuality, often permits
such transgressions as contempts of court to be over-
looked and allowed to go unnoticed by the judges of
the courts; and the public welfare, the morals, the
good behavior, and the proper consideration of a com-
munity for governmental functions are thereby greatly
injured." The defendant insisted that the statute of
Oklahoma provided for the punishment of criminal
contempt upon indictment by the grand jury. It says:
"The legislature intended that the public itself might
also have a right to prosecute these offenses,—not to
take away the power which the court already had to
punish the offender, but prescribe a means in addition
to that already possessed for such punishment." It

then proceeds: "The power to punish for contempt of court is inherent in all courts of record." Ex parte Robinson, 19 Wall. 505; In re Millington, 24 Kan. 214; People v. Stapleton (Colo. Sup.), 33 Pac. Rep. 167; Middlebrook v. State, 43 Conn. 257; Holman v. State, 105 Ind. 513, 5 N. E. Rep. 556. The court also very well says in its opinion: "We decline in this case to give character to a manufactured sentiment by joining in the too often repeated discussion of a perverted application of our beneficent heritage of freedom of speech and liberty of the press. During these occasions, when crime stalks abroad cloaked in the garb of liberty, and when the assassin of our highest and noblest institutions of civil government would audaciously bid the hand of justice bestow reward for punishment too long deserved, we are reminded of the historic words of Madam Roland: 'Oh Liberty! How many crimes are committed in thy name!' and resolve that the shield of the innocent shall not be the weapon of the guilty."

In the case of the Territory v. Murray, decided by the supreme court of Montana, and reported in 15 Pac. Rep. 145, it was decided that the sending and publication of a telegram in a newspaper of general circulation of a dispatch that two persons (real estate agents), on the day of the sending of the telegram, made a wager of $500 that, owing to the influence of some persons interested in a cause pending before the supreme court of Montana, the court would reverse their former decision, was a flagrant contempt of court; and this court also held that the acts of congress had no application to the courts of a territory, and that the disclaimer of the defendant in his affidavit of any intention to treat the court with the slightest contempt in publishing the telegram was not binding upon the court, but that it might inquire into the truth of the matter. "The meaning and intent of the defendant in publishing the

dispatch must be determined by a fair interpretation of the language used. The construction and tendency of the publication as bearing upon its character as a contempt are matters of law for the court." Henry v. Ellis, 49 Iowa, 205; People v. Wilson, 64 Ill. 195; and numerous other authorities.

In the case of Cooper v. People (decided by the supreme court of Colorado), 22 Pac. Rep. 790, the court quotes from the case of Watson v. Williams, 36 Miss. 331, as follows: "The right to punish contempts by summary convictions is a necessary attribute of judicial power, inherent in all courts of justice from the nature of their organization, and essential to their existence and protection and to the due administration of justice. It is a trust given to the courts not for themselves, but for the people whose laws they enforce and whose authority they exercise; and each court has the power for itself finally to adjudicate and punish contempts without interference from any other. The right to punish for contempts extends not only to acts which directly and openly insult or resist the powers of the court or the persons of the judges, but to indirect and constructive attempts which obstruct the progress and degrade the authority of the courts." In this case, the supreme court of Colorado, speaking of the pretended right of trial by jury in contempt proceedings says: "Prior to, and at the time of the adoption of these constitutional provisions, courts had at common law the undoubted authority to punish summarily, without a trial by jury, both constructive and direct contempt. And it is difficult to see how the provisions in reference to jury trials in suits and prosecutions for libel can be so construed as to either extend this right to contempt proceedings, or to support the argument that, as jury trials are not allowed in matters of contempt, therefore the constitution takes away the power to punish as for a contempt for matters spoken, written, or pub-

lished beyond the immediate view or presence of the court, although presenting no barrier to summary punishment for direct contempts. No court has ever yet held that the right of trial by jury extends to contempt proceedings, and to so decide would defeat the very object of the power. So to hold would place it in the power of a vicious person so to conduct himself as to prevent any kind of a trial. As we have seen, the power to punish summarily for contempt is essential to the very existence of the court. Cooley, Const. Lim., p. 390, note 3.'' The authority of the courts to punish summarily, as for contempt, parties publishing articles in reference to causes pending, when such publications tend to corrupt or embarrass the administration of justice, has been expressly upheld, notwithstanding the existence of such constitutional provisions. State v. Morrill, supra; Myers v. State, 22 N. E. Rep. (Ohio Sup.) 43; State v. Frew, supra; Sturoc's Case, 48 N. H. 428; 2 Bish. Cr. Law, 259. In State v. Morrill, supra, the court said: ''The counsel for the defense suppose that the power of the courts to punish, as for contempt, the publication of libels upon their proceedings, was cut off by the seventh section of the bill of rights, which is in these words: 'The printing presses shall be free to every person, and no law shall ever be made to restrain the rights thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and think on any subject, being responsible for the abuse of that liberty,' is an answer to the argument of the learned counsel. It is a well known fact that the bench and bar have been in this and all other countries, where the law has existed as a distinct profession, the ablest and most zealous advocates of liberal institutions, the freedom of conscience, and the liberty of the press; and none have guarded more watchfully the encroachments of power, on one hand, or deprecated more

earnestly tendencies to lawless anarchy and licentiousness, on the other. The freedom of the press, therefore, has nothing to fear from the bench in this state. No attempt has ever been made, and we may venture to say never will be made, to interfere with its legitimate province on the part of the judiciary by the exercise of the power to punish contempt."

In the case of State v. Faulds, 42 Pac. Rep. 285, the supreme court of Montana, in an opinion rendered November 11, 1895, quotes with approval the following from the case of State v. Morrill, 16 Ark. 384. The court says: "If an ignorant or impolite man stalks into a courthouse with his hat on, or makes a noise about the door, or disobeys process, all agree that he may be punished for contempt; but if a man has an important case pending in court, and, willing to resort to desperate measures to succeed, publishes, on the eve of the trial, a libel, alleging that the judge has been bribed to charge the jury against him, and that all the witnesses who are to appear on behalf of the opposing party have been corrupted and are unworthy of credit, it is no contempt, and the judge must labor under the embarrassment of sitting in the case, under such circumstances, with his mouth closed. Or if a judgment is rendered against a man, as soon as the judge leaves the bench, he is met at the door, insulted, and assaulted by the party, in consequence of his decision, and then a publication is made in a newspaper charging him with corruption in rendering the judgment, and calling upon the community to disregard and resist its execution, and yet this is no contempt!" The supreme court of Montana also says: "Such publications are an abuse of the liberty of the press, and tend to sap the very foundation of good order and well-being in society, by obstructing the course of justice. If a judge is really corrupt and unworthy the station which he holds, the constitution has provided an

ample remedy by impeachment or address, where he can meet his accuser face to face, and his conduct may undergo a full investigation. The liberty of the press is one thing, and licentious scandal is another. The constitution guarantees to every man the right to acquire and hold property by all lawful means, but this furnishes no justification to a man to rob his neighbor of his lands or goods." This court, in reference to the facts stated that the constitution of Montana limits the power of the two houses of the legislature to punish for contempt, but does not restrict the common-law power of the court, says: "There is a good reason why the framers of the constitution might well have made this distinction. The legislature is a political body. If its proceedings and the conduct and motives of its members are unjustly assailed by libelous publications, they may defend their official conduct, and repel attacks through the press and upon the 'stump;' but it is not the usage of the country, nor would it comport with the dignity of judicial stations, for judges to resort to newspapers or the public forum in defense of the integrity of their decisions, etc., and it should be an unwise policy that would drive them to such a course." State v. Faulds, 42 Pac. Rep. (Mont.) 285.

Parties have a constitutional right to have their causes tried fairly in court, by an impartial tribunal, uninfluenced by newspaper dictation or popular clamor. What would become of this right if the press may use language in reference to a pending cause calculated to intimidate or unduly influence or control judicial action? Days and sometimes weeks are spent in the endeavor to secure an impartial jury for the trial of a case; and, when selected, it is incumbent upon the court to exercise the utmost care in excluding evidence of matters foreign to the issues involved, so that the mind of the juror may not perchance be unduly biased or prejudiced in reference either to the litigants or to the mat-

ters upon trial. But if an editor, a litigant, or those in sympathy with him, should be permitted, through the medium of the press, by promises or threats, invective sarcasm, or denunciation, to influence the result of the trial, all the care taken in the selection of the jury, as well as the precaution used to confine their attention at the trial solely to the issues involved, will have been expended in vain.

In the case of Myers v. State, it is decided by the supreme court of Ohio (1889): "The furnishing by a correspondent for publication, and procuring to be published, in a newspaper, an article containing statements regarding a judge then engaged in the trial of a cause, imputing to him conduct in respect to the case on trial, which, if true, would render him an unfit person to preside at a trial of the cause, with knowledge on the part of the correspondent that such newspaper has a large circulation in the county where the trial is in progress, and with reasonable grounds to believe that the same will, when published, be circulated in the court room and about the courthouse during said trial, and there read, and which was afterward, during the trial, circulated and read therein, is a contempt of court." 22 N. E. Rep. 43. It is also decided in this case that, though the libel was in a large part against the presiding judge, that fact did not disqualify him from trying the proceedings for contempt. It was not the libel against the judge which constituted the offense for which the respondent was liable as for contempt of court. The offense consisted in the tendency of his acts to prevent a fair trial of the cause then pending in the court. It is this offense which constitutes the offense, and for which he could be punished summarily; and the fact that, in committing this offense, he also libeled the judge, and may be proceeded against by indictment therefor, is no reason why he may not and should not be punished for the offense against the ad-

ministration of justice. This is also decided in the case of the People v. Stapleton, 33 Pac. Rep. 167, by the supreme court of Colorado.

In the case of Ex parte Barry, 25 Pac. Rep. 62, it is decided by the supreme court of California that a publication made by a newspaper after the judge of the superior court has sustained a demurrer to a petition, with leave to amend, denouncing the judge for his action, is a flagrant abuse of the liberty of the press, and an unlawful interference with the proceedings of the court, punishable by fine and imprisonment as for contempt.

In the case of State v. Frew (decided by the supreme court of West Virginia), 24 W. Va. 416, the authorities are also reviewed at great length from nearly every state in the Union, and all to the same effect.

In Spalding v. People, 7 Hill, 301, it was said by NELSON, C. J. (afterward an associate justice of the supreme court of the United States): "The remedy by indictment is ofttimes found too tardy for the exigency of the case; hence the law has always authorized the more summary proceeding by attachment as for a criminal contempt, whereby the offender is arraigned at once upon the charges, and the courts of justice more promptly vindicated and sustained."

But, in our opinion, the judges of this court would have been guilty of a most flagrant failure to appreciate the dignity of the position which they hold, and their duty to the proper administration of justice, had they shrunk, however unpleasant it might have been to themselves, from meting out to the offender in this case adequate punishment. It may be properly said in this connection that the court was under no obligations to credit the statement of the respondent Hughes that he was ignorant, and could form no opinion, as to who was the author of the article in question. The state-

ment bears the stamp of improbability upon its face. The fact that he has vicariously suffered punishment for the author of the article as well as himself should not have commended him to the sympathy of the court, or in any way induced it to mitigate the sentence which was imposed upon him. The court might feel itself called upon to comment upon the conduct of the author of the article in permitting the publisher of the newspaper to stand between the author and the punishment which justice demands. It is difficult to conceive of a man possessed of so contemptible a spirit as, in the guise of secrecy, to write so flagrant a libel upon the character of a court as this newspaper article was, and when the publishers thereof publish to the world under oath that they were ignorant of the author of the article at the time of its publication, and still are so ignorant, not to come forth and avow its authorship. The retraction published by the respondent Hughes should in the minds of all honest and fairminded men, answer at once the proposition that the publication was made by him innocently. How could such a publication be made innocently when he admits that it was false, and that he had no information whatever upon which to base it, and his attention called to its libelous character by his associates before it was printed?

As already stated in this opinion, the answer of the defendant and his subsequent conduct aggravate, instead of mitigate, his offense. It would have been idle, in the opinion of a majority of this court, for the court to have imposed in this instance a mere fine. It might have been possible, and perhaps is probable, that the real author of the article, who escapes punishment, would have come forward and furnished the respondent sufficient money to liquidate the fine had the punishment not been imprisonment.

The court has felt constrained to say this much as the matter was one of duty imposed upon it in the

administration of justice and vindication of the law. It is true that the disbarment proceedings seem to have stirred up a great deal of political feeling and prejudice, due to the prominent standing of one, at least, of the respondents; but that fact neither justified the publication of the libel, nor relieved the court from the necessity of discharging an unpleasant duty. Neither was it in the power of the court, when the charges were preferred against the respondents in the disbarment proceeding, to omit to cause those charges to be investigated. Such an omission would have been a failure to discharge a duty imposed upon the court to the public interest and the proper administration of justice, as well as to the respondents themselves. It is hard to understand how it could be contended for a moment that, in justice to the respondents themselves, there should not have been a full and complete investigation of the charges made against them.

The failure of every well-meaning citizen to dispassionately consider and understand the principles of law that govern the courts in such cases as this, and to sustain the court without regard to the different political complexions of the judges who constituted the court or the citizen himself, is seriously to be deprecated, and argues badly for the prospect of good government in any community or state. Political clamor and prejudice should never be permitted to interfere with the administration of justice and the law, and the judge who yields to it is unfit to fill the position which he holds.

SMITH, C. J., and COLLIER, J., concur.

BANTZ and HAMILTON, JJ. (dissenting).—We have filed a separate opinion, and concur in finding respondents guilty of contempt, but dissent from the punishment inflicted, and some of the views expressed herein by a majority of the court.

This is a proceeding in contempt against the publishers of a newspaper in respect to an article reflecting upon the members of this court, published in relation to a cause then pending. It was conceded at the bar by counsel for Mr. Hughes, one of the publishers, that the article was false, wicked, and harmful; and, although our jurisdiction to punish therefore as a contempt was fully conceded, yet we base our jurisdiction upon the distinct ground that the publication was of a nature calculated and intended to exercise an influence upon the decision of a cause then pending, independently of the law or the evidence produced, and thereby sought unlawfully to interfere with and obstruct the administration of justice. The protection of the citizen against that so-called "liberty of the press," in false, reckless, and malignant assaults, is ordinarily to be found in a civil action or indictment. Even though the publication be in respect to a court of justice, we are not prepared to hold, nor is it necessary in this case to hold, that such publication can be the lawful subject of contempt proceedings, however harsh and unjust the criticism; provided it does not impute impure motives, and is confined to decisions or transactions entirely past, and contains no element affecting some cause pending and undetermined. In People v. Wilson, 64 Ill. 214, after announcing the general proposition that published criticisms of decisions, opinions, or official conduct of the court or its members, in regard to cases that have passed beyond the court's jurisdiction, will not be punishable as a contempt, and that the judicial and all other departments of the government are open to examination and public discussion, yet the court say it is not within the liberty of the press, "to control the administration of justice or influence the decision of pending causes." And Lawrence, C. J., pertinently observes: a court will, of course, endeavor to remain wholly uninfluenced by

publications like that under consideration, but will the
community believe that it is able to do so? Can it even
be certain in regard to itself? Can men always be sure
of their mental poise? A timid man might be influ-
enced to yield, while a combative man would be driven
into the opposite direction. Whether the actual influ-
ence is on one side or the other, so far as it is felt
at all it becomes dangerous to the administration of
justice. Even if a court is happily composed of judges
of such firm and equal temper that they remain wholly
uninfluenced in either direction, nevertheless a dis-
turbing element has been thrown into the council
chamber, which it is the wise policy of the law to ex-
clude." In People v. Stapleton, 33 Pac. Rep. 167, the
supreme court of Colorado, in 1893, observed upon this
subject: "If the courts of justice may be publicly
assaulted by libel and slander, or otherwise threatened
or traduced in respect to causes, civil or criminal, pend-
ing before them for hearing or trial, then indeed, no
one's rights are any longer safe, and life, liberty, and
property are held by a feeble tenure in this common-
wealth." Imperfect as judicial examinations may be,
both sides have a full opportunity to be heard in open
court before judgment is rendered; and more danger
is to be apprehended from the power of the press over
the courts than from the power of the courts over the
press. In view of the nature and tendency of the pub-
lication set out in this proceeding, and to which we
have already called attention, we are entirely satisfied
as to our jurisdiction in this case, and of the guilt of
the respondent.

The respondent declares under oath that no con-
tempt was, in fact, intended; that, since the publica-
tion, he has ascertained the falsity of the charges, and
expresses a willingness to publish a full retraction. If,
under all the circumstances, the language of the publi-
cation, by any fair interpretation, could be harmonized

with good faith on the part of the respondent, we might consider ourselves bound by this answer; but the expressions contained in the publication are too direct and full to be overborne by a disclosure now of what were hitherto secret mental reservations. The respondent, Thomas Hughes, has not therefore purged himself of such contempt; but we do not believe the punishment of imprisonment by the court is warranted.

SMITH, C. J.—I concur in the conclusion that the respondent is guilty of gross licentiousness in the abuse of the liberty of the press, and of willful contempt of this court, but I dissent from the suggestion that a court is subject to imputation of impurity and partisanship after the determination of a cause. It is public policy that judicial tribunals shall be maintained in their dignity, and, until they have so offended that they are liable to impeachment, it is inherent that they shall protect themselves by the exercise of their official power, especially as they are precluded the privilege of otherwise redressing the wrongs done them in their official capacity. The judgment of the court may be condemned and its critic may specify its errors and demonstrate its unwisdom, but its motive can not be assailed. If a high crime or a misdemeanor has been committed, let the offender be arraigned before the bar empowered by the constitution to try such crimes.